H. M. PHARR *v*. THE STATE.

1. SELF-DEFENCE — CHARGE OF THE COURT. — Instructions on the right of self-defence should not limit the justification to the imminency of real danger, ignoring the appearance of imminent danger, in view of which the defendant may have acted.

2. MURDER IN THE FIRST DEGREE. — It is not all *homicide*, but all *murder*, committed in the perpetration or attempt at the perpetration of robbery, rape, arson, or burglary which is made murder in the first degree by our Penal Code. Malice, therefore, the characteristic element of all murder, cannot be dispensed with or ignored in a proper charge to a jury trying an

indictment for murder so committed. But implied as well as express malice constitutes a murder so committed murder in the first degree.

3. CHARGE OF THE COURT.—No intimation of the opinion of the court upon the truth or falsity of any part of the evidence should be communicated to the jury, either by the charge or in any other manner.

4. ALLEGATA ET PROBATA.—The motive upon which a homicide was committed is more properly a subject of proof than of pleading.

APPEAL from the District Court of Johnson. Tried below before the Hon. J. ABBOTT.

By the indictment, the appellant, Henry M. Pharr, was charged with the murder of an unknown white man, on July 14, 1877, by shooting him with a gun. The case came to trial at the June term, 1879, when the jury found the defendant guilty of murder in the first degree, and judgment of death was rendered thereon in accordance with the law before the Revised Codes took effect.

The deceased was described in the indictment as an unknown white man, about twenty-five years of age, and none of the State's witnesses knew his name at the time of the trial. But Stephen Johnson, a witness for the defence, was able to give some account of him. The witness and others went from Blanco County to Kansas, in the spring of 1877, with a drove of cattle. In the latter part of June of the same year, he, with the defendant, a man named Lamb, and the deceased, whose name was Harrell, left Kansas together for Texas. They travelled in company until they got ten or fifteen miles below Fort Worth and ten or twelve north of Alvarado in Johnson County, when they separated. This was on or about July 13, 1877. The defendant and Harrell came on together towards Alvarado. The party had been earning $30 each per month as drovers, but none of them had much money when they left Kansas. The defendant had more than any of the rest, and in the Indian Territory had let the witness have $20, and afterwards a small sum at Fort Worth. Their necessary expenses from Kansas were about $10 each. The deceased

had a small pony worth $10 or $15, a six-shooter which he carried in his saddle-bag, and but very little money, at Fort Worth. The party played cards on their route from Kansas. The defendant, according to the witness, bore the character of a peaceable and quiet young man.

R. D. Richardson, a witness for the State, saw the defendant and the deceased the evening before the latter was killed. They came to witness's house, one and a half miles north-west from Alvarado. Defendant was riding a mule and had a gun; the deceased was riding a small pony and had no weapon in sight. They bought some forage from witness, and he saw them again the next morning as they passed his house going towards Alvarado. They seemed perfectly friendly to each other. On the 14th of July, 1877, being the day he last saw them together, witness saw the dead body of the deceased in Alvarado, and recognized it as that of the man who was with the defendant.

By other witnesses for the State it was proved that the defendant and the deceased were in Alvarado the day of the homicide, inquired there for the road to Hillsboro, and left together in that direction. About a mile and a half from Alvarado they were met by a witness, who was bringing melons to the village for sale. They bought two melons, for which the deceased paid, and witness saw that he had three currency bills folded together. They asked him about the Hillsboro road. They were next seen by another witness, who was travelling behind them in a wagon, and as near to them as two hundred yards. After they passed over a hill, which intercepted the witness's view of them, he heard the report of a gun or pistol, and as he drove on he saw some one run out from the bushes into the road, pick something up, and run back into the bushes. The witness thought nothing about it as he drove on, but, having gone on a mile or so and got a load of wood, he returned along the same road, and examined the spot and bushes to see what had been done there. Seeing blood in the road

and on the bushes, he followed the trail, and came to the dead body of the deceased, who had on no hat, and whose shirt had been torn off. One of his boots was gone, and one pocket turned inside out. The leg upon which there was no boot seemed to have been hurt by a rope. Nothing in this witness's testimony identified the defendant as the person who fired the shot, or who ran out of the bushes into the road and back. Before he saw the body of the deceased it had been found by another witness, Mr. Walker, who lived close by. When found by him, there was a rope around the leg of the deceased, and his body was considerably bruised by dragging. He had been shot just behind the left ear, and the bullet came out on the right cheek, or, according to another witness, in the right temple. The body lay seventy-three yards from the road, and had been dragged from the road along a cow-path.

Thomas Coulter, a deputy-sheriff, testifying for the State, said that he had seen the deceased and the defendant, with their pony and mule, the day before the homicide ; and hearing of that event, he and the others took the trail, and pursued it to Hillsboro and eight miles beyond, where they came up with the defendant. He was in company with another man, and was eating his supper by the side of the road. The witness arrested him, and took him back to Hillsboro. Some of the party told the defendant the cause of his arrest, and, after leaving Hillsboro the next morning, "defendant," says the witness, "admitted to me that he had killed deceased, but said he had killed him in self-defence, though defendant had previously denied that he had done the killing. * * * He stated that he and deceased had travelled together from Kansas, and had been playing cards, and that he (defendant) had won the pony of deceased at cards ; and that on the morning of the killing they were riding along, and got into a conversation about the pony defendant had won, when the deceased told the defendant that he had to give him back his horse. Defend-

ant replied that he would not do it, when deceased said, 'Well, I will kill you then,' and immediately reached his hand into his saddle-bags to get his pistol ; and, believing that deceased .was going to kill him, he stopped his mule, which threw deceased a little ahead of him, when he raised his gun and shot deceased.   *   *   *   That after he had killed the deceased he started back to Alvarado to give himself up to the officers, and got about half a mile from the place of the killing, when he met a man in the road, whom he asked how far it was to Alvarado.   Defendant stated that after meeting this man he went on in the direction of Alvarado, but, being alone and a stranger, he became frightened, and concluded to go on home.''   The defendant, when arrested, had the pony and saddle-bags which the deceased had had, a six-shooter, some clothing in the saddle-bags, three five-dollar bills, and three twenty-five-cent bills.

L. E. Easley, for the defence, stated that on the morning of the killing he was going from Alvarado to mill, and about a mile and a half south of Alvarado met the defendant, who was coming in the direction of Alvarado.   Defendant was riding a pony in a gallop, but stopped and asked witness how far it was back to Alvarado.   Witness told him the distance, and defendant galloped on towards Alvarado.   Where they met was between a quarter and a half a mile towards Alvarado from the place where the deceased was killed.

Quite a number of witnesses appeared for the defendant, who had known him well in Blanco County for several years · previous to the homicide.   They concurred in giving him an excellent character as a peaceable and quiet boy. The opinion discloses all other facts of any note.

.Brown, Hall & Ramsey, and Jack Davis, for the appellant.

Thomas Ball, Assistant Attorney-General, for the State.

Winkler, J.   We are of opinion there are errors of a material character prejudicial to the rights of the defendant

in the charge of the court. The charge of the court on homicide in self-defence was substantially the law of homicide on previous threats, which was not the law of the case as made by the testimony adduced on the trial. The defence, if any was proved, was a killing on appearances of pressing and imminent danger, which, if true, would have justified the defendant to act, and have required him to act with the utmost promptness; and this view of the case should have been presented to the jury in the charge of the court. *Marnoch* v. *The State,* decided by this court at the present term, and authorities there cited, *ante*, p. 269. By the charge as given, the defendant was restricted to acting only on real danger, and not on the appearances of danger as they presented themselves to him at the time.

Again: the court charged, in effect, that if the jury believed that the unknown white man described in the indictment died from the effects of a gunshot wound inflicted on him by the defendant as charged in the indictment, and that such killing was unlawful as in the charge explained, and was committed in the perpetration or in the attempt at the perpetration of robbery as before explained, then the jury were instructed to find the defendant guilty of murder in the first degree. The defect in this portion of the charge is that it ignores malice, the indispensable requisite in all murder; without malice, either express or implied, there can be no murder. Again: it is not homicide committed in the perpetration or attempt at the perpetration of robbery which is by the Code murder in the first degree, but it is all murder committed in this manner that constitutes the crime murder in the first degree. If a murder — that is, a homicide — was committed in the perpetration or in an attempt at the perpetration of robbery, and having the necessary ingredient of malice, whether express or implied, such killing would be murder in the first degree. Penal Code, art. 606; *Tooney* v. *The State,* 5 Texas Ct. App. 163.

And again: the charge does not place and keep before

.the minds of the jury the distinction between murder generally on express malice, and murder committed in the perpetration or attempted perpetration of robbery, so as to prevent the jury from confounding the two views of the case in determining the question of the guilt or innocence of the defendant under the proofs adduced. And again : after the court had given the jury an appropriate charge on circumstantial evidence, a qualification, to say the least unnecessary, was added, to this effect : " The same degree of certainty, however, is not required, except as to the intent with which the act is done, when the State offers in evidence, without objection on part of defendant, the admissions or confessions of the defendant, provided the same show that the defendant admitted or confessed that he did the act of killing."

We deem it important to notice another error in the charge, which is as follows : " While it is the duty of the jury to weigh and consider all the statements of the defendant that have been offered in evidence, they may act upon and believe such part or parts of the same as they believe, from all the facts and circumstances in evidence, to be entitled to credit or worthy of belief, and may disregard such part or parts as they deem unworthy of belief." This portion of the charge was calculated to neutralize a previous portion, which was substantially correct, to this effect : " When the admissions or confessions of a party are introduced in evidence by the State, then the whole of the admissions or confessions are to be taken together, and the State is bound by them unless they are shown to be untrue by the evidence ; such admissions or confessions are to be taken into consideration by the jury as evidence, in connection with all the other facts and circumstances of the case." It must be borne in mind that the whole defence of the defendant rested on the fact that he had said he had killed the deceased, but did it in self-defence, coupled with that other portion of the same statement drawn out on

the cross-examination of the witness who testified to it, and which, coming as it did, was legitimate testimony to go to the jury, to the effect that when the deceased said he would kill the defendant he was attempting to get his pistol, when the defendant raised his gun and fired. Now, all this may have appeared to the court to be a mere pretence and fabrication; but if so, the court should not have conveyed to the jury, by any word in the charge, or in any other manner, what his impressions really were as to any part of the testimony.

It seems to us that by that portion of the charge which permitted the jury to consider the testimony of the statements of the defendant they were authorized to believe so much of his statement as admitted the killing, and reject such portions as set up his justification for the act of killing, and which arose out of the testimony introduced by the State. "When part of an act, declaration, or conversation or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other, — as when a letter is read, all other letters on the same subject between the same parties may be given. And when a detailed act, declaration, conversation, or writing is given in evidence, any other act, declaration, or writing, which is necessary to make it fully understood or to explain the same, may also be given in evidence." Code Cr. Proc., art. 751. It is the province of the judge to deal with the law of every criminal case, but he is not at liberty to express any opinion as to the weight of evidence, and it is beyond the province of a judge sitting in criminal causes to discuss the facts. Code Cr. Proc., arts. 677, 678. " The jury are the exclusive judges of the facts in every criminal case, but not of the law in any case. They are bound to receive the law from the court, and be governed thereby." Code Cr. Proc., art. 676; *Stuckey* v. *The State*, decided at the present term, *ante*, p. 174.

The sufficiency of the indictment is called in question by the

appellant's counsel, and we are referred to *Tooney* v. *The State*, 5 Texas Ct. App. 163, in support of the argument; the argument being that the indictment is not sufficient to support a conviction for murder committed in the perpetration or attempt at the perpetration of robbery, that fact not being specially averred in the indictment. There is a clearly definable difference between the two indictments, and *Tooney's Case* does not sustain the argument. The indictment in the present case is believed to be sufficient as one for murder in the ordinary form. As to the motive or inducement which influenced the killing, that is more a subject of proof than pleading.

For the above errors in the charge of the court, the judgment is reversed and the cause remanded.

*Reversed and remanded.*